CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

SEP 2 2 2005

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| ROBB HARKSEN, )<br>    Plaintiff, )<br>)<br>v. )<br>)<br>OFFICER MULLINS, JR., et al., )<br>    Defendants. ) | Civil Action No. 7:04-cv-00244<br><br>**MEMORANDUM OPINION**<br><br>By: Hon. James C. Turk<br>Senior United States District Judge |

Plaintiff Robb Harksen, a Virginia inmate proceeding pro se, brought this action under the Civil Rights Act, 42 U.S.C. §1983, with jurisdiction vested under 28 U.S.C. §1343. By opinion and order entered November 24, 2004 (Dkt. Nos. 7 & 8), the court dismissed many of Harksen's claims, pursuant to 28 U.S.C. § 1915A(b)(1), and identified the remaining claims that were then served upon the defendants. Defendants filed a motion to dismiss and numerous motions for summary judgment. By order entered July 27, 2005, the court gave Harksen until September 5, 2005, to file his comprehensive response to all of the defendants' dispositive motions. As of today, the court has not received any response from Harksen. Nevertheless, as the deadline for his response has passed, the court considers all of defendants' motions ripe for disposition. Upon consideration of the record, the court concludes the defendants are entitled to dismissal or summary judgment on all claims except one.

**I. Procedural Background & Remaining Claims**

Harksen originally filed the claims in this action as "Amended Claim 4" to Harksen v. Hale, Civil Action No. 7:03-cv-00653. By opinion and order in the Hale case, the court determined that Claim 4 was improperly joined to Claims 1 and 2 in the Hale case. Therefore, in

1

the interest of judicial economy, the court severed Claim 4 and directed the clerk to file it as this separate civil action. The November 24, 2005, memorandum opinion and order stipulated that only the following claims survived dismissal under § 1915A(b)(1) and were served on the defendants:

- Claim A1, to the extent that it alleges deliberate indifference to a hazardous condition against Wallens Ridge State Prison (WRSP) Officer Mullins, Jr. on August 25, 2000, in knowingly giving Harksen a razor belonging to an inmate infected with a serious, infectious disease;

- Claim A1 and A5, to the extent that these claims allege deliberate indifference by Dr. Damron, starting in August 2000 at WRSP, to Harksen's serious medical need for treatment of Hepatitis B (HBV);

- Claim A2, to the extent that it alleges deliberate indifference to Harksen's serious medical need for HBV treatment starting in October 2002 at Red Onion State Prison (ROSP) by Dr. P. Williams, Dr. P. Greene, Dr. A. Edelman, Fred Schilling, and Prison Health Services (PHS);

- Claim E, to the extent that it alleges use of excessive force against Harksen by the following ROSP defendants who authorized, or placed and/or maintained Harksen in, ambulatory restraints for eight hours: C/O Mullins, C/O Vanover, Major Fleming, and Warden D. A. Braxton;

- Claim F, to the extent that it alleges use of excessive force by Officer Fleenor on March 7, 2002, at ROSP, and deliberate indifference by Officer Steele to a known risk of harm from the alleged assault by Fleenor; and

- Claim G, to the extent that it alleges deliberate indifference by Dr. Williams and Fred Schilling to Harksen's alleged, serious need for medical treatment of a knee problem, starting in September 2002 at ROSP.

The court later granted Harksen's motion to amend his complaint to add state law claims under the Virginians with Disabilities Act against Defendants Williams, Green, Schilling, Edelman and PHS.

## II. Standards of Review

The court may properly grant a motion to dismiss under Rule 12(b)(6) when, construing allegations in the light most favorable to plaintiff and assuming facts alleged in the complaint to be true, it is clear as a matter of law that no relief could be granted under any set of facts that could be proved consistent with the allegations. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). While the court must construe factual allegations in the nonmoving party's favor and treat them as true, the court need not treat the complaint's legal conclusions as true. Estate Constr. Co. v. Miller & Smith Holding Co., 14 F.3d 213, 217-18 (4th Cir. 1994); Custer v. Sweeney, 89 F.3d 1156, 1163 (4th Cir. 1996) (in 12(b)(6) analysis, court need not accept plaintiff's "unwarranted deductions," "footless conclusions of law," or "sweeping legal conclusions cast in the form of factual allegations") (internal quotations and citations omitted).

Rule 56©) of the Federal Rules of Civil Procedure mandates entry of summary judgment against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. Id. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). When a motion for summary judgment is made and properly supported by affidavits, depositions, or answers to interrogatories, the non-moving party may not rest on the mere allegations or denials of the pleadings. Fed. R. Civ. P. 56(e). Instead, the non-moving party must respond by affidavits or otherwise and present specific facts showing that there is a genuine issue of disputed fact for trial. Id. Summary judgment appropriately lies for the movant if there can be

only one reasonable conclusion drawn from the evidence, against the non-moving party. Anderson, 477 U.S. at 247-48. Detailed factual allegations in a verified, pro se complaint may be sufficient to withstand a motion for summary judgment with supporting affidavits containing a conflicting version of the facts. Davis v. Zahradnick, 600 F.2d 458 (4th Cir. 1979). Where a pro se plaintiff fails to respond to defendants' specific evidence contradicting the conclusory allegations of his complaint, however, defendants may be entitled to summary judgment.

### III. Opinion of the Court

#### A. The Razor Claim

Harksen alleges the following sequence of events in support of Claim A1. Mullins gave Harksen another inmate's razor to shave with on August 25, 2000. Harksen cut himself with the razor before discovering that it belonged to someone else. Harksen immediately demanded, and within a few days underwent, a blood test for HIV exposure. On November 9, 2000, Mullins allegedly told Harksen, "Remember that razor I gave you to shave with? Hope you did yourself nice with it. Everyone knows that [inmate's] got AID's [sic]. I was trying to give it to you." Harksen asserts that he did not learn that he had tested positive for HBV until October 2002, when Dr. Williams at ROSP mentioned to him that he had tested positive for HBV in September 2000.

Mullins asserts that this claim is barred by the statute of limitations because Harksen did not bring the deliberate indifference claim within two years of its accrual as required under the applicable statute of limitations. See Va. Code Ann. §8.01-243(a); Owens v. Okure, 488 U.S. 235, 239-40 (1989). A cause of action under §1983 accrues and the statute of limitations begins

4

running "when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." Nasim v. Warden, Md. House of Correction, 64 F.3d 951, 955 (4th Cir. 1995)(en banc).

The court's records reflect that in November 2001, Harksen filed a § 1983 retaliation claim against Mullins for the razor incident, and after the court initially dismissed that claim without serving the defendant, Harksen tried to reinstate it in 2002.[1] See Harksen v. Unnamed Defendants, Civil Action No. 7:00-cv-00962, Dkt. No. 25 (Amended Complaint, Claim 10 at ¶162 and ¶ 221). The court finds no need to resolve this complicated statute of limitations question, however, because Mullins is entitled to summary judgment as a matter of law on two other grounds.

Mullins presents undisputed evidence that Harksen failed to exhaust administrative remedies before filing this lawsuit, as required by 42 U.S.C. § 1997e(a). This provision requires that an inmate must exhaust available administrative remedies before filing a civil action. See Dixon v. Page, 291 F.3d 485 (7th Cir. 2002). According to the sworn affidavit of B. Ravizee, WRSP grievance coordinator, WRSP grievance records reflect that Harksen did not file any grievances asserting that Mullins purposely gave him a razor belonging to another inmate

---

[1] The court summarily dismissed the razor claim in Civil Action No. 7:00-cv-00962, pursuant to 28 U.S.C. § 1915, finding that Harksen did not allege that he had since tested positive for HIV or that Mullins' actions had chilled his litigation efforts. (Dkt. No. 27 at p. 79). In November 2002 and again in April 2003, buried in responses filed in Civil Action No. 7:00-cv-00962, Harksen attempted to reinstate the razor claim against Mullins, based on the "new" October 2002 evidence of his HBV infection. (Dkt. No. 56, ¶ 41, and Dkt. No. 184, ¶ 45). In March 2005, the court denied Harksen's requests to reinstate the razor claim in Civil Action No. 7:00-cv-00962, noting that the claim was going forward in this newer case instead. (Dkt. No. 205 at p. 37 n. 45). See also Civil Action No. 7:04-cv-00244, Dkt. No. 7 at p. 9 n. 7 (recognizing Harksen's earlier instigation of, and attempts to reinstate, razor claim in Civil Action No. 7:00-cv-00962). Harksen learned Mullins' first name only through discovery in the newer case in March 2005; Mullins waived service in May 2005.

infected with a serious, infectious disease in hopes that Harksen would contract that disease. Harksen's pleadings in this action do not allege that he filed any grievance or appeal about Mullins' alleged attempt to give him a disease, and he has not submitted any additional affidavit or evidence contradicting Ravizee's affidavit.[2] The court finds no genuine issue of material in dispute as to Harksen's failure to exhaust his administrative remedies before filing this lawsuit as required under § 1997e(a) and will grant Mullins' motion for summary judgment.[3]

## B. The Hepatitis B Claims

### 1. Plaintiff's Allegations

Harksen asserts that the medical defendants denied him appropriate treatment for HBV between September 2000 and February 2004, and alleges the following facts in support of his claims. On September 5, 2000, days after the razor incident on August 25, Harksen saw Dr. Damron who ordered a blood test. A staff member drew Harksen's blood on September 6, 2000. Harksen's requests to see the blood test results went unanswered. Harksen later discovered that on September 8, 2000, Dr. Damron received the blood test results, which indicated that Harksen had tested positive for the Hepatitis B virus (HBV). Harksen first learned of these positive test

---

[2]Harksen does allege filing a complaint in September 2000 about being cut with another inmate's razor, and prison officials granted his request for a blood test for disease exposure. He does not allege that he filed a grievance in November 2000 after Mullins allegedly told him the razor switch was intentional.

[3]In any event, the claim fails utterly on the merits. Defendant Damron presents undisputed evidence that according to the results of the September 2000 blood test, Harksen was infected with HBV long before the August 2000 razor incident. Thus, Harksen could not prevail in his deliberate indifference claim against Mullins. Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993) (Eighth Amendment claim of deliberate indifference to hazardous condition requires showing of serious or significant harm resulting from challenged condition).

6

results from Dr. Williams at ROSP on October 10, 2002. Harksen asserts that Dr. Damron intentionally withheld the positive test results in order to avoid having to treat Harksen for the disease. Harksen further asserts that if Dr. Damron had treated his HBV infection with "immune globulin" shots within fourteen days of the razor incident, he would not now be suffering effects of HBV.

Harksen also alleges that Defendants Williams and Green at ROSP, and Defendants PHS and Edelman, knew Harksen needed treatment for HBV, but did not provide it during a period from October 10, 2002 through November 2003.[4] Harksen alleges that although Dr. Williams, and later Dr. Green, knew as treating physicians that he needed treatment, they did not provide any at ROSP, and when they asked PHS to authorize consults for him with a specialist, Edelman refused. Harksen complains that although blood tests had already confirmed his HBV infection, the doctors repeatedly ordered more blood tests instead of treating his known condition. Defendants also allegedly knew Harksen was complaining physical symptoms of HBV,[5] but did not offer HBV treatment.

## 2. Defendants' Evidence

Defendants' affidavits and attached medical records offer the following evidence. When

---

[4] Harksen also filed a motion for interlocutory injunctive relief, seeking HBV treatment for his ongoing condition. The court denied that motion, and Harksen's appeal of the issue is currently pending.

[5] Harksen complained of fatigue, light colored stools, dark urine, abdominal pain near his liver, severe headache, and fever. He admits that nurses provided him with aspirin on two occasions and Pepto-Bismal on at least one occasion; he also received a shot to prevent flu and pneumonia and was vaccinated against another form of Hepatitis.

Harksen requested a blood test for HIV in September 2000, Dr. Damron also ordered tests for two other blood borne diseases, HBV and the Hepatitis C virus (HCV). The test results indicated that Harksen's Hepatitis B Surface antibody was 2.0 and his Hepatitis B Core Antibody was "positive." In Dr. Damron's professional medical opinion, these test results indicated that Harksen had been exposed to HBV in the distant past. As his positive core antibody could not possibly have developed in twelve days, it is not possible that he contracted the disease from the August 25, 2000 razor cut. This result also clearly indicated that Harksen was not in a position in September 2000 to benefit from administration of immunoglobulin or the Hepatitis B vaccine. Finally, the test results and Harksen's lack of symptoms indicated that he did not have chronic active Hepatitis B requiring any form of medical treatment for HBV in September 2000. Dr. Damron did not see Harksen again after September 8, 2000, and quit working at the prison in early October 2000.

Dr. Williams saw Harksen for "chronic care for HBV" on October 10, 2002 at ROSP. The VDOC "chronic care" policy requires medical monitoring of an inmate's condition four times per year to determine whether treatment is needed. After reviewing Harksen's bloodwork, it was not clear to Dr. Williams whether Harksen had active HBV that might require treatment or whether he simply had had HBV in the past and recovered. Dr. Williams explained to Harksen that he would order additional blood tests to confirm Harksen's condition. A technician drew Harksen's blood on October 15; Dr. Williams reviewed the results on October 23, 2002, and found them equivocal. On October 24, 2002, the doctor submitted a written request to Prison Health Services (PHS) for permission to have Harksen examined by a specialist at the University

8

of Virginia hepatology clinic (UVA) via video. Dr. Edelman responded for PHS,[6] stating that no referral to UVA would be granted unless Harksen's blood tested positive for the Hepatitis B e antigen and in the event of such a finding, a second test was positive for Hepatitis B viral load. Dr. Williams ordered the additional bloodwork and received test results on November 13, 2002. The test was negative for the Hepatitis B e antigen. This result indicated that Harksen was not in the active phase of the disease and did not need a consultation at UVA. Dr. Williams ordered further blood tests to monitor Harksen's condition in January 2003. Before Dr. Williams stopped working at ROSP on January 18, 2003, he reviewed Harksen's bloodwork. Once again, the results were negative for the Hepatitis B e antigen.

Dr. Williams referred the matter to Dr. Green, who ordered regular blood tests to monitor Harksen's condition in April and July of 2003 and in February 2004. Each time Harksen's blood tested positive for the surface antibody and the HBV e antibody, but negative for the HBV e antigen, indicating that Harksen was not in the active phase of HBV. His bloodwork also showed that his liver function test (ALT) was within normal limits, indicating that Harksen was not suffering liver damage. Because of Harksen's complaints of pain, Green requested authorization to have Harksen's condition reviewed by a UVA specialist, but Edelman replied

---

[6]Pursuant to VDOC policy, treating doctors forwarded requests for off-site referrals to PHS, a private medical care organization. Dr. Edelman, an PHS administrator from October 2002 until August 2003 at PHS headquarters in Richmond, reviewed the medical information provided to him with the requests for referrals for Harksen. Edelman recommended that no off-site referral was warranted, given the blood test results and symptoms noted in the medical records. The VDOC medical director decided to follow Edelman's recommendation and disapprove Harksen's referral to UVA. If Harksen or the ROSP medical could have appealed to the VDOC medical director regarding this decision. Edelman and PHS did not have authority to order VDOC doctors or medical directors to provide or refrain from providing treatment, nor did they have authority to override doctors' orders.

for PHS that he did not recommend a referral because the blood work did not show any active disease. Edelman also noted that Harksen was a carrier of the disease and should take appropriate precautions to avoid spreading it to others. Green saw Harksen for the last time on February 19, 2004, and advised him that his blood work did not show any active disease or liver damage requiring treatment.

Individual doctors working for the VDOC do not have authority to order that an inmate be treated for HBV. Such treatment usually involves administration of the drug Interferon and/or Lamivudine and carries numerous risks, including depression, suicide, flu-like symptoms, low blood count, anemia and bleeding. Before starting the drug therapy, the patient must undergo a liver biopsy, a procedure that can result in bleeding, infection or even death.

### 3. Applicable Law

A prison official's deliberate indifference to an inmate's serious medical need violates the Eighth Amendment. See Estelle v. Gamble, 429 U.S. 97, 102 (1976). A constitutional violation in this context involves both an objective and a subjective component. The objective component is met if the deprivation is "sufficiently serious." Farmer v. Brennan, 511 U.S. 825, 834 (1994). A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir.1999); Sheldon v. C/O Pezley, 49 F.3d 1312, 1316 (8th Cir. 1995). The subjective component is met if a prison official is "deliberately indifferent," that is if he "knows of and disregards an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837; Johnson v. Quinones, 145 F.3d 164,

168-69 (4th Cir. 1998)(because doctors did not know inmate had pituitary gland tumor, failure to diagnose and treat it did not state Eighth Amendment claim even though inmate ultimately went blind). A claim concerning a disagreement between an inmate and medical personnel regarding diagnosis and course of treatment does not implicate the Eighth Amendment. <u>Wright v. Collins</u>, 766 F.2d 841, 849 (4th Cir. 1985). Questions of medical judgment are not subject to judicial review. <u>Russell v. Sheffer</u>, 528 F.2d 318 (4th Cir. 1975). Moreover, mere malpractice does not state a federal claim, <u>Estelle</u>, 429 U.S. at 105-106, nor does mere negligence in diagnosis. <u>Sosebee v. Murphy</u>, 797 F.2d 179 (4th Cir. 1986). Finally, plaintiff must produce evidence of a serious or significant physical or emotional injury. <u>Strickler</u>, 989 F.2d at 1379.

## 4. Analysis

No reasonable jury could find from the evidence presented that the defendants violated Harksen's Eighth Amendment rights with regard to his HBV infection. Harksen offers no contradictory medical evidence to dispute the medical records and affidavits that defendants offer. His conclusory allegations of what his medical tests and symptoms indicated or what doctors said he needed are insufficient to present any genuine issue of material fact in the face of defendants' summary judgment evidence.

First, no jury could find from the evidence that Harksen needed HBV treatment of any kind in September 2000. Damron, in his professional assessment of the September 2000 blood test results, believed that Harksen had been infected with HBV long before the August 2000 razor incident and thus would not benefit from any immediate measures to prevent infection. Dr. Damron also believed that Harksen did not suffer from any active form of the disease warranting

11

any form of treatment in September 2000. As Dr. Damron clearly did not know of any serious medical need Harksen had for HBV treatment, his failure to provide treatment or to notify Harksen of test results did not create or aggravate any risk of harm to Harksen.

Furthermore, none of Harksen's subsequent treating physicians has identified any medical need for Harksen to receive HBV treatment, as test results through February 2004 showed that he had no active HBV or liver damage. The record also reflects that all of the defendant doctors took reasonable actions in response to Harksen's HBV test results. It is undisputed that Dr. Williams and Dr. Green consistently monitored Harksen's condition, ordered diagnostic tests, requested referrals to specialists, and examined him for medical complaints. Dr. Edelman recommended against specialty referrals, based on medical evidence, but advised regular blood work and caution to avoid spread of the disease. As defendants' medical judgment based on repeated medical tests indicated that Harksen had no medical need for HBV treatment, he cannot show that anyone violated his constitutional rights by denying him such treatment, particularly given the significant health risks and negative side effects that accompany the treatment. Harksen's self-diagnosed symptoms of Hepatitis B and his inexpert assessment of his condition and his need for HBV treatment show nothing more than his personal disagreement with defendants' professional treatment decisions; such a disagreement does not present any actionable claim under §1983. Finally, Harksen offers no evidence that he suffered harm as a result of defendants' actions. The court concludes that Defendants Damron, Green, Williams, Edelman and PHS[7] are entitled to summary judgment as a matter of law as to Harksen's HBV

---

[7]PHS, as a private corporation, could only be liable under § 1983 if plaintiff proved that an official policy or custom of the organization caused a deprivation of constitutional rights. See Austin v. Paramount Parks, Inc., 195 F.3d 715, 728 (4th Cir. 1999). As Harksen offers fails to

12

Case 7:04-cv-00244-JCT-mfu Document 110 Filed 09/22/05 Page 12 of 20 Pageid#: 629

claims under § 1983.

The court will also grant summary judgment for Defendant Schilling as to these claims.. This official is an administrator, not a medical professional. He rightfully relied on the doctors' assessments that Harksen's blood tests did not indicate any active form of HBV that would warrant providing him the risky drug therapy he was demanding. See Miltier v. Beorn, 896 F.2d 848 (4th Cir. 1990) (nonmedical prison personnel may rely on opinion of medical staff as to proper course of treatment).

### 5. State Law Claims

Harksen has also raised a claim that defendants' improper treatment of his HBV violated his rights under the VDA. See Va. Code §§ 51.5.40-45. This act prohibits discrimination solely on the basis of an individual's physical or mental disabilities. Under the plain language of the statute itself, the VDA does not provide a legal remedy for negligent medical treatment. Moreover, courts interpreting the same standards for liability in addressing claims under a highly similar federal statute, the Americans with Disabilities Act (ADA) have expressly found that these provisions do not create a cause of action for the negligent medical treatment of disabled persons. See, e.g., Bryant v. Madigan, 84 F.3d 246, 249 (7th Cir. 1996 (ADA is not violated by prison's failure to attend to medical needs of disabled person); Tyndall v. National Educational Centers, Inc., 31 F.3d 209, 216 (4th Cir. 1994) (recognizing that VDA standards for liability follow standards adopted in ADA).

Harksen offers no evidence on which any jury could find that the defendants denied him

---

establish any constitutional violation here, PHS is entitled to summary judgment as a matter of law.

13

treatment for HBV solely <u>because</u> he is disabled by HBV. Rather, defendants denied him drug therapy for HBV because repeated diagnostic blood tests indicated that he was not in an active phase of the disease and so was not a candidate for the drug therapy that he demanded. Moreover, Harksen's allegations that defendants improperly diagnosed the extent of his HBV condition and failed to recognize his need for drug therapy state nothing more than medical negligence claims, not actionable under the VDA or § 1983. The court will grant summary judgment for Defendants Williams, Green, Edelman and PHS as to Claims A1, A5, and A2, and will grant Schilling's motion to dismiss.

### C. Four-Point Restraints

Harksen's allegations in support of Claim E are artfully vague. One day at ROSP, Officers Jeff Mullins and William Vanover denied Harksen and other inmates in his pod their outdoor recreation periods, based on false charges that the inmates had covered the vents in their cells. Other inmates began kicking their cell doors, demanding emergency grievances. Mullins and Vanover left and returned with a group of officers, including Major Fleming. When Harksen demanded an emergency grievance, these officers falsely charged Harksen with kicking his door and put in a "hobble chain" (also referred to as ambulatory restraints) for over eight hours. Harksen describes the "hobble chain" as a set of shackles and handcuffs welded together so that an inmate wearing such restraints must lie "hogtied" on the floor of his cell, unable to straighten up, walk, or use the toilet. Harken alleges that his term of restraint in the hobble chain caused him "extreme physical trauma" to his back and gouges in his wrists and ankles. He was also left to urinate on himself because he could not use the toilet while in the restraints. Harksen does not

14

provide the date of this incident.

Defendants offer evidence that Harksen filed grievances and appeals at ROSP about only one incident meeting the above description. Harksen filed an informal complaint form on November 8, 2001, stating that on that day, Mullins and Vanover had denied him recreation, refused an emergency grievance form, brought false charges against him for kicking the door, and placed him in chains.[8] The grievance coordinator states that ROSP has no record of Harksen filing grievances at ROSP about any other ambulatory restraint incident involving these defendants. Harksen has not refuted defendants' evidence.

Defendants argue that if Claim E concerns the incident on November 8, 2001, it is barred under the statute of limitations because Harksen did not file the claim within two years of its accrual. The court must agree. Harksen submitted Claim E as part of an amendment to <u>Harksen v. Hale</u>, Civil Action No. 7:03-cv-00653 (Dkt. No. 11). The court date-stamped the amendment as received on January 12, 2004. Harksen's cover letter to the amendment, dated December 23, 2003, asserts that Harksen first attempted to file his original complaint in <u>Hale</u> beginning in May 2003, but officers returned it for additional postage and lost pages of it; then, Harksen had to recopy pages to leave normal, one-inch margins and send the several-hundred-page complaint in sections to the court. He does not state in that letter that he delivered Claim E to prison authorities in proper mailing form on or before November 8, 2003. Moreover, his cover letter makes it clear that any problems he had in mailing his complaint to the court earlier arose from his own decision to cram as many claims as possible into one, bulky complaint. Taking the facts

---

[8] Harksen grieved to the highest level of appeal available under VDOC procedures the noted complaints about the defendants' actions on November 8, 2001, but he did not specifically complain about conditions he suffered while restrained in the chains.

15

in the light most favorable to Harksen, the court finds that he "filed" Claim E–by delivering it in proper mailing form to prison authorities–no earlier than December 23, 2003, more than two years after the events of November 8, 2001. See Lewis v. Richmond City Police Depot, 947 F.2d 733 (4th Cir. 1991). Any claims concerning defendants' actions on November 8, 2001, are thus barred by the statute of limitations. §8.01-243(a). The court finds no genuine issue of material fact in dispute and will grant defendants' motion for summary judgment as to Claim E.[9]

## D. Excessive Force on March 7, 2002

The initial facts of Claim F are undisputed. On March 7, 2002, at ROSP, Officers Fleenor and Steele escorted Harksen to the showers. He refused to comply with an order to step onto the scales for a routine weight check. Based on his behavior, the officers returned him to his cell without a shower. Harksen went to his knees as ordered so that Fleenor could remove the shackles. At this point, the parties' versions of the story diverge. Harksen asserts that Fleenor jerked the chain so that the shackles cut into Harksen's ankles, threw Harksen face-first onto the concrete floor, grabbed his hair and repeatedly slammed his face into the floor, resulting in a gash to Harksen's chin that required five stitches and caused him later pain in his jaw and

---

[9]To the extent that Harksen's allegations in Claim E concern another ambulatory restraint incident on a later date, the claim must be dismissed because he did not exhaust administrative remedies before filing the lawsuit. § 1997e(a). In any event, Harksen fails to produce any evidence to support his conclusory allegations that the supposed trauma to his back and/or gouges to his wrists constituted more than de minimis harm. Therefore, the court concludes that Claim E also fails on the merits. See Norman v. Taylor, 25 F.3d 1259 (4th Cir. 1994) (de minimis injury can be conclusive evidence that the force used was also de minimis and not violative of constitutional protections); Strickler v. Waters, 989 F.2d 1375 (4th Cir. 1993) (to state Eighth Amendment claim regarding prison conditions, inmate must demonstrate serious or significant injury resulting from those conditions).

16

difficulty chewing. Harksen further asserts that Steele did not stop Fleenor's assaultive behavior and further injured Harksen's ankles by standing on the shackles. Fleenor and Steele state that Harksen tried to pull away and then to stand up as Fleenor attempted to remove his shackles and that to gain control over his disruptive behavior, they "placed" him on the floor. They admit that Harksen acquired a cut on his chin during this time period, but deny that they intentionally caused any pain or injury to Harksen.

The court finds that the remaining excessive force and deliberate indifference portions of Claim F survive summary judgment. Harksen's factual allegations in his verified complaint[10] as to the assault and the extent of his resulting injuries, see, i.e., Dkt. No. 11, starting at p. 199, ¶¶ 1-5, 9, 22-23, 31, are sufficiently detailed to create genuine issues of material fact in dispute as to whether Harksen's behavior was disruptive, whether the officers used force maliciously to inflict pain or in good faith to restore order, whether Steele was deliberately indifferent to a known risk that Fleenor would harm Harksen, and whether Harksen's injuries were more than de minimis. See Hudson v. McMillian, 503 U.S. 1, 6-7 (1992); Norman v. Taylor, 25 F.3d 1259 (4th Cir. 1994). Therefore, the court must deny summary judgment on behalf of Defendants Fleenor and Steele as to these claims, and the matter will be set for trial.

---

[10] As stated, Harksen submitted the claims in this action as an amendment to an earlier case, but has stated that the amendment was simply part of his intended complaint in case, which he was unable to mail to the court at one time. See Civil Action 7:03-cv-00653, Dkt. No. 11, cover letter. Because the original complaint submitted in 7:03-cv-00653 was verified (signed by Harksen under penalty of perjury), in an abundance of caution, the court finds that his amendments to that complaint, including the claims filed as Civil Action No. 7:04-cv-00244, are also verified.

17

Case 7:04-cv-00244-JCT-mfu Document 110 Filed 09/22/05 Page 17 of 20 Pageid#: 634

## E. Knee Problems

Harksen alleges these facts relevant to Claim G. Harksen came to see Dr. Williams on September 26, 2002, at ROSP, complaining that his knee was swollen and painful because having to kneel for shackling procedures had aggravated his chronic knee problems. He asked Dr. Williams to drain the fluid from his knee and to write medical exemptions so that Harksen could avoid kneeling or have help from officers during shackling and could possess an elastic knee brace that had been confiscated for cited security reasons. Harksen alleges that Dr. Williams agreed that draining the knee was the "proper thing to do," but said he "didn't know how to do it" so it "couldn't be done." Dr. Williams refused to write any medical exemption because of security risks. While examining Harksen's knee, Dr. Williams' manipulation of the knee caused Harksen pain, and he continued with the exam even after Harksen told him that it was painful. Harksen returned to his cell without any treatment or medication for pain.

Dr. Williams presents the following evidence. When he examined Harksen's knee on September 26, 2002, he found "slight effusion, but no deformity." In his professional opinion, he saw no need to drain Harksen's knee. He prescribed Motrin for pain, 600 mg., twice daily for two weeks, and discussed exercises with Harksen. He told Harksen to seek followup care as needed. Harksen did not present with knee problems before Dr. Williams left ROSP in January 2003.

Taking the evidence in the light most favorable to Harksen, the court cannot find any genuine issue of material fact in dispute as to his claim that Dr. Williams acted with deliberate indifference to any serious medical need. Estelle, supra. Dr. Williams did not ignore Harksen's

18

knee problem. Rather, the medical records reflect Dr. Williams' medical judgment that the knee was swollen, but not deformed, and that appropriate treatment was Motrin on a short-term basis, unless Harksen returned with further knee complaints. Harksen's fanciful quotes of the doctor's verbal statements about draining the knee are not sufficient to contradict Dr. Williams' specific evidence that he did not find or note any medical necessity for such action. Harksen also does not refute Dr. Williams' evidence that he prescribed Motrin for Harksen's pain. Although he claims he did not receive the medication, he does not allege that he ever notified the doctor of that fact or that he filed the appropriate requests to see the doctor again about his knee pain. Furthermore, as Dr. Williams believed the knee did not present a need for additional treatment, his failure to provide the requested drainage treatment or medical exemptions was a reasonable response. Harksen's self-diagnoses of his knee condition and his opinion as to appropriate treatments state nothing more than disagreement with the doctor's medical judgment, and such claims are not actionable under § 1983. No reasonable jury could find that Dr. Williams was aware of any serious medical need that he failed to treat. Therefore, the court will grant summary judgment for Dr. Williams.

The court will also grant summary judgment for Defendant Schilling. He rightfully relied on Dr. Williams' medical assessment that Harksen's knee required no treatment other than pain medication and exercises. Miltier, supra.

### F. Conclusion

In accordance with the foregoing, the court will deny summary judgment for Defendants Fleenor and Steele as to Harksen's claim that Fleenor assaulted him and Steele failed to

19

intervene on March 7, 2002. As to all other claims and defendants, the court will grant the motion to dismiss and all motions for summary judgment. An appropriate order shall be issued this day.

The Clerk is directed to send certified copies of this memorandum opinion and accompanying order to plaintiff and to counsel of record for the defendants.

ENTER: This 22nd day of September, 2005.

_____
Senior United States District Judge